A. A. HUGHES *v*. THE STATE AND J. E. MOWINKLE.

1. ESCHEAT.—Section 20, art. 4, of the Constitution of 1869, requiring the Comptroller "to take charge of all escheated property, to keep an account of all moneys paid into the treasury and all lands escheated to the State," is in conflict with and revokes the authority conferred by the act of 1848 (Pas. Dig., 3667) upon the District Court to order the sale of escheated property.
2. CONSTRUCTIVE REPEAL.—*Quere*, Whether the "act to provide for vesting in the State escheated property (Pas. Dig., 3657 to 3675) is in force since the adoption of the present State Constitution in 1869."
3. ESCHEAT, PLEADING.—Under said statute a petition filed by the District Attorney to escheat property should allege that such petition is filed in the county having probate jurisdiction over the estate of the deceased whose estate is sought to be escheated, the death of such party, and that he died without heirs or any devisee of such property.
4. ESCHEATED LANDS are not subject to location as vacant lands, nor will a junior patent for such land held by another be aided by proceedings taken by the District Attorney to escheat such property.
5. PRE-EMPTION cannot be taken on lands pending proceedings to escheat such lands, nor could such pre-emption claim be interposed in defense against proceedings instituted by the District Attorney to escheat the same.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson. The facts are set out in the opinion.

*B. Trigg, District Attorney,* and *Cullen & Denton,* for the State.

*Terrell & Walker,* for Mowinkle.

*James B. Morris,* for appellant.

The act of 1848, (Pas. Dig., 3657, *et seq.*,) under which this suit was brought, is repealed by the present Constitution of Texas.

Section 10 of the act, (Pas. Dig., 3666,) "When any judgment shall be rendered that the State be seized or possessed of any estate, such judgment shall contain a description thereof, *and shall vest the title in the State.*"

Section 11 (Pas. Dig., 3667) is as follows:

"A writ shall be issued to the sheriff of the proper county, commanding him to seize such estate vested in the State; and if the same be personal property or real estate, he shall dispose thereof at public auction, in the manner provided by law for the sale of property under execution."

The above two sections, when construed alone, would appear to give the District Court just such power as the court below attempted to exercise in the case at bar. But let us examine the act.

Its caption is as follows: "An act to provide for vesting in the State escheated property." (See page 210, Gen. Laws, 2d Leg.) On page 107, Potter's Dwarris, I find the following language: "Taken in connection with what are acknowledged parts of the statute, (which it is not,) the title, where the intent is not plain, may slightly assist in removing ambiguities, although it frequently alludes to the subject-matter of the act only in the most general or sweeping terms, and very often is not co-extensive with the provisions of the act."

I will now show the applicability of the above extract to the subject under discussion. We have just read the title to the act. Section 14 of the act (Pas. Dig., 3670) reads:

"The Comptroller shall keep just accounts of all moneys paid into the Treasury, and of all lands *vested in the State* under the provisions of this act." And section 18 (art. 3674) is as follows: "That all property escheated under the provisions of this act *shall remain subject to the disposition of the State as may hereafter be prescribed by law.*" These sections are so inconsistent that they should be held self-destructive.

Now, if the act of 1848, above discussed, did not intend to have the escheated land sold, it was from the beginning a nullity, as far as the same attempted to affect real estate, for the reason that if it merely intended to vest title in the State, it should have provided for a valuation of the land and allowed the heirs to sue the State for the same, just as section 15 (art. 3671) provides for the heirs to proceed against the State for the purpose of recovering the money for which the estate was sold. But no such valuation of the land, the title to which might be vested in the State, there to remain at the will of future Legislatures, was then nor has since been provided for. Hence such vesting of title in the State would be unadulterated *confiscation*, after the most approved English fashion, and be diametrically opposed to the guarantees of the 5th amendment of the Constitution of the United States and sec. 14 of the Bill of Rights in our Constitution. If the property was attempted to be taken for public use, which is not the case, even then the same law providing for the taking must also provide for making the "just compensation" to the owner as "absolutely certain as that the property is taken," (B. B. Brazos and C. R. R. *v.* Ferris, 26 Tex., 602.) and thus is the *coup de grace* administered to the only interpretation of the so-called escheat law of 1848, which does not outrage common sense and the well-established rules of construction. The *dernier ressort*, then, is left appellees of sheltering themselves under the construction placed upon the act by the court below.

Our present Constitution provides (sec. 6, art. X, of the Constitution as amended) that "the Legislature shall not hereafter grant lands, except for purposes of internal improvements, to any person or persons, nor shall any certificate for land be sold at the land office, except to actual settlers upon the same, and in lots not exceeding one hundred and sixty acres: *Provided,* That the Legislature shall not grant out of the public domain more than twenty sections of land for each mile of completed work in aid of the construction of which land may be granted: *And provided further*, That nothing in the foregoing proviso shall affect any rights granted or secured by laws passed prior to the final adoption of this amendment."

The article thus amended was precisely as the above article down to the first proviso, if we exclude the words "except for purposes of internal improvement." This proceeding was commenced on the 28th of September, 1872, before the amendment was finally adopted, and hence at the time when the legislative department was positively enjoined from granting the public land to any person for any purpose, and when the land office was positively enjoined from selling land to any one except actual settlers, and then in tracts not to exceed one hundred and sixty acres; and the amendment above copied cannot in the least affect appellant, for it is not claimed that the State wants his land for the purpose of internal improvements. Section 8 of the same article donates one hundred and sixty acres to every head of a family, on the condition that he will select, locate, and occupy the same for three years, and pay the office fees on the same.

Such, then, was the Constitution of Texas in regard to the legislative power over the public lands, both at the institution of this suit and its trial.

It will not be denied, I presume, that had the 12th or 13th Legislature passed an act of escheat similar to the act of 1848, so much of such law as confers the power to

sell land, which might become the property of the State, on sheriffs, through the orders of a District Court, would be absolutely null and void. For how would it be possible for a Legislature to delegate a power which it does not possess? To sustain the judgment of the court below, then, will be simply to say that the *time* of the passage of a law is the test of its constitutionality; that if it was a constitutional act at the time of its passage, it will remain constitutional, no difference how obnoxious it may be to the present Constitution, until its formal repeal by the legislative power. Such a condition of things would give one a due appreciation of what is meant by the remark, "It is like the laws of the Medes and Persians, which never change;" but the engrafting of which into the rules of construction I think this court will hesitate to do, because it would be an entire destruction of the rule, "If two inconsistent acts be passed at different times, the last is to be obeyed; and if obedience cannot be observed without derogation from the first, it is the first which must give way." Thus spoke a learned judge in regard to inconsistent acts of the same authority. (See Sedgwick on Statutory and Constitutional Law, page 125; Potter's Dwarris, page 155.) And again: "It has been repeatedly declared that every statute is by implication a repeal of all prior statutes, so far as it is contrary and repugnant thereto, *and that without any repealing clause.*" (Ib., 125; Smith's Commentaries on Constitutional Construction, page 898.) The rule, then, in reference to contrariant acts of a Legislature, which cannot be harmonized, is clear: "*Leges posteriores, priores contrarias abrogant.*" That our present Constitution positively forbids the Legislature to authorize a District Court to sell the land of the State cannot be doubted, because no one will claim that the Legislature can delegate a power which has been expressly taken from it. We come face to face, then, with the issue. Can a law which is repugnant to the plain intent of an existing Constitu-

tion be enforced because it was passed at a time when it was constitutional? This is the issue. It cannot be evaded. No sophistries about trustees, &c., can dodge it. The language of the act of 1848 is unequivocal on this point. It provides that the title to the escheated land shall be vested absolutely in the State, that the fee shall pass into the State, and that then the sheriff shall sell the land which has become the absolute property of the State to the highest bidder, and convey the fee-simple title to the land out of the State to the purchaser at said sale. This is the intent of the judgment in this case, and to sustain it a capacity of holding on to all that comes within its grip, equal to that of the devil fish, must exist in the judicial power.

In the case of Osborn v. United States Bank, 9 Wheat., 738, Chief Justice Marshall says: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts, of themselves, are the mere instruments of the law and of the Government, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion—a discretion to be exercised in discerning the course prescribed by law; and when that is discerned it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge, always for the purpose of giving effect to the will of the Legislature, or, in other words, to the will of the law."

That the Constitution of a State, when not repugnant to the Constitution or laws of the United States, is the supreme law of the State is not an open question. (See Potter's Dwarris, page 353, et seq.) Therefore, under the definition of Chief Justice Marshall, the judicial power must be exercised always for the purpose of giving effect to the will of the *Constitution.*

That the adoption of a new Constitution by a State repeals all repugnant existing laws is not an open question

now. (See Sedgwick on Statutory and Constitutional Law, page 490; Cass *v*. Dillon, 22 Ohio, 607.)

The principle governing the question having been laid down, I will now cite a case in point. The question as to the right of a member of the Supreme Court of the State of New York to take part in the decision of the same cause in the Court of Appeals which he sat in on the Supreme Bench being mooted, Justice Bronson said: "Under the Constitution of 1821 the Chancellor and Justices of the Supreme Court, though members of the court for the correction of error, were forbidden to take part in the affirmance or reversal of their own decrees or judgments. (Art. 5, § 1.) This provision, with an extended application, afterwards became a part of the statute, as follows: No judge of any appellate court, or of any court to which a writ of *certiorari* or of error shall be returnable, shall decide, or take part in the decision, of any cause or matter which shall have been determined by him when sitting as a judge of any other court. (2 R. S., 275, § 3.) The Constitution of 1821 has been abrogated, and the only question is whether the statute has not been virtually repealed. I think it has. The Constitution of 1846 confers the same power on all the judges of the Court of Appeals, and on all the justices of the Supreme Court, with the single exception that no judicial officer can exercise his office while under impeachment." (Pierce *v*. Delamater, 1 Comstock, page 17.)

The case at bar presents, if anything, stronger points to sustain my position, that the escheat law of 1848 has been abrogated by the adoption of the Constitution of 1870, than the learned judge based his opinion on in the last-cited case. The act of 1848 was passed, not in pursuance of an express power, but by *permission* of the Constitution of 1845. The Constitution of 1870, as amended, expressly *forbids* the Legislature from granting lands to any one except for the purpose of internal improvement, and posi-

tively enjoined the selling of certificates at the land office except to actual settlers.

The case at bar comes under neither of the exceptions. Thus the general power permitted by the Constitution of 1845 to be exercised by the Legislature over the public lands of the State has been revoked. This revocation revoked all power over the subject which the Legislature had remitted to sub-agents. (Story on Agency, § 469, and authorities there cited.)

When the Constitution on this point was changed, all legislation which had been based on this constitutional permission became lifeless. Its source of power was dried up. The principal has fallen to the ground, and all dependent legislation, which, like vines, had grown up around and drew their vitality from it, must likewise fall prostrate, and be known in our judicial records no longer. Therefore, I believe I am sustained by reason and authority when I say that we have no escheat law in Texas, except as the same is established as a finale to administration by the probate act of 1870.

MOORE, ASSOCIATE JUSTICE.—This suit originated in the District Court of Travis county by a petition filed by the District Attorney, in the name of the State of Texas, to escheat two tracts of land, one of six hundred and forty acres, situated in said Travis county, the other of eight hundred and thirty-five acres, situated in Llano county, alleged to have been the property in his lifetime of one R. S. M. A. de la Tulle.

Title to land by escheat originated from and was a consequence of the feudal law, whereby, upon the failure of heirs of the person last seized, who may lawfully take the estate by succession, it fell back or reverted to the original grantor, his descendants, or successors. And, as under the general doctrine of tenures in the American States, the State occupies the place of the feudal lord by virtue of its

sovereignty, it is universally asserted that, when the title to land fails for lack of heirs or devisees, who may lawfully take, it reverts or escheats to the State as property to which it is entitled. (4 Kent, 470.)

This has certainly been the law of tenure in Texas from the organization of the Government. The Constitution of the Republic declares that escheats which had accrued to Coahuila and Texas should accrue to the Republic. (Const. Schedule, sec. 2.) And in the Constitution of the State adopted in 1845, (art. 13, sec. 4,) it is provided that escheats which had accrued to the Republic under the Constitution and laws should accrue to the State. And it is further provided: "The Legislature shall, by law, provide a method for determining what lands may have been forfeited or escheated." And, by sec. 10, art. 4, jurisdiction was given to the District Court of all suits in behalf of the State to recover penalties, forfeitures, and escheats. Like jurisdiction has been conferred upon the District Court in the Constitutions of 1861, 1866, and 1869; and in the latter, by sec. 20 of art. 4, it is further provided that the Comptroller of Public Accounts shall take charge of all escheated property, keep an accurate account of all moneys paid into the treasury, and of all lands escheated to the State.

In fulfillment of the duty imposed upon the Legislature by the provision of the Constitution of 1845, which we have quoted above, the law of March 20th, 1848, entitled "An act to provide for vesting in the State escheated property," was enacted. And it is under the authority supposed to have been conferred by it, no doubt, this suit was instituted and conducted. But whether this statute had not been repealed by the provision in the Constitution of 1869, which we have cited, may, we think, admit of serious question; but as it is not necessary to the determination of the present case, we are not called upon at present to determine it. We think, however, that it is quite evident this

section of the Constitution is in conflict with, and therefore revokes, the authority conferred by the statute of 1848, upon the court to order the sale of escheated land, if such, indeed, can be held to be the proper construction of this statute in view of the conflicting provisions of its different sections; and for this reason, if no other, the judgment in this case should be reversed.

We are of opinion, however, that the petition is altogether insufficient to authorize an escheat of the property described in it under the provisions of the statute under which the suit was brought, if it is still in force. The first section of the statute reads: " If any person die seized of any real or possessed of any personal estate, without any devisee thereof, and having no heirs; or where the owner of any real or personal estate shall be absent for the term of seven years, and is not known to exist, such estate shall escheat to and vest in the State." The essential facts upon which title by escheat should vest in the State are set forth in this section. These, as expressed in the first clause of the section, are distinctly stated to be death of the owner without a devisee, and having no heirs—that is, where there is no one in being who can, on the death of the owner, claim or hold under a will or the laws of the State regulating descent and distribution of estates of intestates. Evidently, it was not the purpose of the Legislature, if it had been competent for it to do so, to confer upon the State title to property, under color of a proceeding to escheat it, to which it was not entitled under its sovereignty as the original and ultimate proprietor of all the lands within its jurisdiction. It may be said that the second clause of the section escheats the property of all persons who are absent for the term of seven years, and are not known to exist. To vest property in the State simply by reason of the absence of the owner for any particular length of time, whether known to exist or not, might be a forfeiture of the property, but it certainly would not be to escheat it.

The section is very inartificially drawn, but manifestly it was not intended by this clause to vest in the State property to which it could claim no title under and by virtue of the well-known character of right, for which this statute, in its title, declares it is enacted to provide, by reason of other facts, which, at most, are merely presumptive evidence of the existence of one of the essential elements in such a title. Obviously, the purpose and import of this clause is that proof of absence of one who is not known to exist for the length of time mentioned is presumptive evidence of his death. It is not, therefore, a ground for escheat of itself, but evidence of one of the elements of title by escheat.

The second section of the statute declares and points out the occasions when it becomes the duty of the District Attorney to institute proceedings to vest in the State property to which it may be entitled, and it also sets forth the essential averments which the petition he is required to file shall contain, among which are the facts and circumstances in consequence of which such estates claimed to have escheated. And this petition must be filed in the District Court of the county in which succession upon the estate of the decedent is required to be opened. It follows, therefore, the petition is insufficient, unless it appear, *prima facie*, at least, that it is filed in the county entitled to administration upon the estate, and it must, with other matters to be stated, distinctly allege the death of the party whose estate is to be escheated, and that he died without any devisee thereof and having no heirs.

The allegations in this petition to meet these requirements of the statute, are: "Said R. S. M. A. de la Tulle has been absent from the State of Texas a great number of years, to wit, for more than seven years; that it is believed, and is therefore charged, that said de la Tulle has been dead for more than seven years; that there has been no administration upon the estate of said de la Tulle, and there are

no heirs to said estate known to your petitioner; * * * * *
that the county of Travis would have been and still is the
proper county in which the succession should open on said
estate, there being a large portion of the property belong-
ing to said estate situated in said county of Travis."

It will be seen the allegation as to the death of de la
Tulle, and that there are no heirs of his estate, are alleged,
if at all, but vaguely, and by way of argument or infer-
ence, and the petition in this was subject to exception.
And it is totally deficient in negativing the fact that the
estate may have been devised. Certainly it fails in show-
ing, *prima facie*, that Travis county would have been the
proper county in which succession of the estate should
have been opened. The presumption is, that at one time
de la Tulle was domiciled in Bexar county, and he is
alleged to have been a citizen of the State. Although it
is averred that he had been absent a great many years,
yet nothing is stated necessarily inconsistent with the re-
tention of his domicile; but if so, the principal portion
of his estate is not shown to have been situated in Travis
county.

We think, also, the evidence was altogether insufficient
to justify the judgment of the court. The testimony to
support the petition of the State was vague and indefi-
nite, and most of it should have been excluded. The wit-
nesses themselves knew nothing about de la Tulle, and
the fact that Gillespie, who is not shown to have been ac-
quainted with him, told the witness that he was dead, is
certainly entitled to no weight. And the slight inquiry
made at San Antonio, the former residence, and the vague
reports heard there by the witness as to his death, is en-
titled to but little more consideration. Evidently reli-
ance was not placed upon proof of de la Tulle's death
from reputation among his acquaintances, or where he
had been known to have last resided. It seems to have
been supposed not to be necessary to prove his death,

or, if necessary, that this was done by proof of his absence for seven years without being known to exist. But here again the testimony relied upon was equally deficient. Proof of his absence from Travis county, where it was not shown he had ever been in the course of his life, and that he had not been heard of there, or by witnesses who had never known him, was worse than idle. It is equally clear that there was a failure to show that he had died without heirs. On the contrary, there is strong presumption from the evidence, if he is dead, he has left heirs surviving him.

There was error, also, in giving judgment in favor of the intervenor, Mowinkle. If his patent conflicted with the de la Tulle survey, his location, to the extent of the conflict, was illegal and void, and the subsequent proceedings by the District Attorney to escheat the land held by the older and superior title gave it no validity.

There was no error in sustaining the exceptions to appellant's answer, claiming one hundred and sixty acres of the land as a pre-emptor. The survey and patent of the land to de la Tulle severed it from the mass of the public domain, and though it may be reinvested in the State again as escheated property, it will not become thereby subject to location or pre-emption until this has been done, if then, without direct legislation subjecting it to such appropriation. Certainly no such claim can be made pending the proceeding to escheat. If appellant can pre-empt the land upon which he claims to have settled as a part of the public domain, from the fact of the right of the State to it as escheated property, he can do this as well after as before the judgment of the court vesting the property in the State, and this suit should not be embarrassed with such a claim.

For the errors herein indicated the judgment is reversed and the case remanded.

REVERSED AND REMANDED.