## AMERICAN LOAN & TRUST CO. v. GRAND RIVERS CO.

(Circuit Court, W. D. Kentucky. March 9, 1908.)

1. CORPORATIONS—MORTGAGES—FORECLOSURE — PROCEEDS OF SALE — PERSONS ENTITLED.

Property of a corporation having been sold in receivership proceedings, an order was passed directing the payment of $3.61½ on each $100 bond of the corporation, and that there should remain in court for the holders of outstanding bonds amounting to $84,200 the sum of $3,043.83, and that each bondholder on surrendering his bonds into court for cancellation should be entitled to withdraw his pro rata of that sum. All of the money was paid out except $1,140, which had remained in the registry of the court since 1894. *Held*, that the money paid into court was a trust fund for the benefit of the bondholders, and, if not claimed by the holders of the outstanding bonds, was subject to redistribution, either to the other bondholders whose claim had not been paid in full or to general creditors, if any, and, if none, to the holders of the corporation's capital stock.

2. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—DEPOSITS IN COURT—STATUTES.

Rev. St. § 995 [U. S. Comp. St. 1901, p. 711], requires money paid into courts of the United States, or received by its officers, to be deposited with the treasurer or assistant treasurer of the United States, or a designated depositary, to the credit of the court, and section 996, as amended by Act Feb. 19, 1897, c. 265, § 3, 29 Stat. 578 [U. S. Comp. St. 1901, p. 711], declares that no money so deposited shall be withdrawn except on order of the judge, and that it shall be the duty of the judge or judges of such courts to cause any money so deposited which has remained in the registry unclaimed for 10 years or more to be deposited in a designated depository of the United States to the credit of the United States. *Held*, that section 996, in so far as it required money deposited in a federal court unclaimed for 10 years to be turned over to the United States, was unconstitutional, as depriving the owners thereof of their property without due process of law.

3. ESCHEAT—PERSONAL PROPERTY—PARENS PATRIÆ—FEDERAL OR STATE GOVERNMENT.

Where money has been deposited in a federal court, and remains unclaimed for a long period, such money, if subject to escheat, belongs to the state, and not to the federal government, as parens patriæ.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Escheat, §§ 18–20.]

Geo. Du Relle, U. S. Atty., for the motion.

EVANS, District Judge. The bill of complaint in this case was filed November 3, 1893, and sought the foreclosure of a mortgage upon certain property located in Kentucky. The mortgage was executed by the defendant (a Kentucky corporation), and was to secure the payment of its negotiable bonds amounting to $1,500,000. A decree was

entered directing the sale of the property, and it was done. Most of the bonds seem in some way (the details of which are not material) to have been taken up in the reorganization scheme whereby an association of the holders of a large proportion of the bonds became the purchaser of the property. Some 842 of the bonds (each for $100) were not included in this arrangement. By the terms of an order entered July 19, 1894, it was provided, inter alia, "that there shall remain in court for the holders of outstanding bonds as hereinafter provided the sum of $3,050." The thereinafter provision was in this language:

"It further appearing to the court that the property sold under the decree brought the sum of $77,000, and that the expense of the foreclosure and receivership amounted to $22,841.97, leaving a balance of $54,158.03 as the net avails of the mortgaged property, it is considered by the court that there is coming to the holder of each $100 of the bonds the sum of $3.61½. It is therefore ordered that there shall remain in court for the holders of the outstanding bonds, amounting to $84,200, the sum of $3,043.83 and the sum of $6.17 for probable future costs, and each bondholder upon surrendering into court for cancellation his bonds will be allowed to withdraw his pro rata of said sum."

Under the operation of these orders all of the $3,050 has been paid out except $1,140. This unclaimed balance has remained in the registry of the court since July, 1894, and yet remains there to meet the purposes for which it was paid in. The bonds to which that money is applicable are still outstanding, and the holders of them were adjudged in the order referred to to be entitled to their pro rata shares of the fund in court. In short, the money was paid into court in special trust for that particular purpose, but if it is not claimed by the holders of those bonds, then it is manifest, upon the face of the record in the case, that it should, by redistribution, be paid to the other bondholders, very much the larger part of whose debts were not paid by the distribution of the $3.61½ on each bond, or if not, then general creditors, if any of the corporation, or, if none, then the holders of the capital stock in the defendant company would evidently be entitled to the remnants.

The United States was never a party to the suit, and had no interest in the subject-matter in litigation, nevertheless the district attorney, on its behalf, has moved the court to enter an order causing the money so in its registry to be deposited in a designated depository of the United States to the credit of the United States in accordance with section 996 of the Revised Statutes as amended by the Act Feb. 19, 1897, c. 265, § 3, 29 Stat. 578 [U. S. Comp. St. 1901, p. 711]. Sections 995 and 996 as the latter was amended are as follows:

"Sec. 995. All moneys paid into any court of the United States, or received by the officers thereof, in any cause pending or adjudicated in such court, shall be forthwith deposited with the Treasurer, an assistant treasurer, or a designated depositary of the United States, in the name and to the credit of such court: Provided, that nothing herein shall be construed to prevent the delivery of any such money upon security, according to agreement of parties, under the direction of the court. [U. S. Comp. St. 1901, p. 711.]

"Sec. 996. No money deposited as aforesaid shall be withdrawn except by order of the judge or judges of said courts respectively, in term or in vacation, to be signed by such judge or judges, and to be entered and certified of record by the clerk; and every such order shall state the cause in or on account of which it is drawn. And it shall be the duty of the judge or judges of said courts, respectively, to cause any moneys deposited as afore-

said, which have remained in the registry of the court unclaimed for ten years or longer, to be deposited in a designated depository of the United States, to the credit of the United States."

It might in some possible state of case be an important question whether independently of such legislation the courts may not have the inherent power to regulate and control the custody of funds in their registries, but such power apart, recognizing the wisdom of doing so, such moneys are by the courts customarily—perhaps universally—deposited in designated depositories, but always "in the name and to the credit of the court," as suggested by section 995, and it might be so deposited with the Treasurer of the United States or with one of the assistant treasurers, and when so deposited would be perfectly safe, but would still remain under the control of the court, and not of Congress, and might at any time be drawn out upon the order of the judge or judges, respectively, to meet the trusts under which it had been paid in. If this were all, there need be no trouble, but by the act of February 19, 1897, c. 265, 29 Stat. 578 (U. S. Comp. St. 1901, p. 711), another clause was added to section 996. It may be well to repeat the language of the amendment and addition which it is essential now to consider. It is as follows:

"And it shall be the duty of the judge or judges of said courts, respectively, to cause any moneys deposited as aforesaid, which have remained in the registry of the court unclaimed for ten years or longer, to be deposited in a designated depository of the United States, *to the credit of the United States.*"

We italicize the words of particular importance in this connection. To do what is required by this language would entirely pervert the object and purpose of the trust upon faith in which the money was paid in. It would remove the money altogether from the control of the court, make it the property of the United States, and put it under the control of Congress. It would arbitrarily seize and transfer it to the government, and in this way deprive all persons who might have an interest in it of that interest without giving them a day in court in respect to the claim of the United States. In short, the property would be escheated to the United States. Hence, in his brief, the learned district attorney, after quoting section 996 as amended, has stated the contention of the government in the following language:

"It is not sought to construe this provision to mean that it is the duty of the judge to cause any and all moneys which have remained in the registry of the court ten years or longer to be deposited to the credit of the United States. The construction contended for is this: That in every case in which it appears from the records and proceedings therein, that a right exists on the part of some person to withdraw such moneys in the registry of the court that his right to withdraw such money has been adjudicated or is not denied or is not in litigation, and that ten years or more have elapsed since that right accrued, without any application on his part to withdraw the same, such moneys become, by force of the statute, the property of the United States, and that it is the duty of the court to cause such moneys to be deposited to the credit of the United States, without any proceeding whatever between them and the person in whose name the money stands, for the purpose of determining his right to the money."

It is important to inquire whether property can be thus forfeited to the United States by the mere fiat of Congress when it is a fund in

court, clearly and certainly belonging to some private citizen as to whom there is no claim that there has been a failure of heirs, but whose only fault has been delay, forgetfulness, or negligence in withdrawing the money. The first section of article 14 of the amendments to the Constitution of the United States prohibits any state from passing any law whereby any citizen shall be deprived of life, liberty, or property without due process of law, and the fifth amendment to the Constitution provides that no person shall be "deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation." It has often been held that the fifth amendment limits the powers of the United States only, and obviously the fourteenth amendment applies alone to the states, ·but the two together cover the whole subject, and prohibit in every way the arbitrary taking of life, liberty, or property by either government. Here, it is proposed to take certain property for public uses without compensation, or an effort to ascertain whether there is an owner or who he is, and to thus deprive certain persons of their property without any process of law whatever. We need not contend, in respect to property of which there is no individual ownership ascertainable, that the powers of the appropriate government may not be exerted to forfeit or escheat it, but if a government inherently possesses such a right, and might enforce it by due proceedings, the proposition here is to enforce or assert the right by mere legislative enactment without any proceeding whatever, either by a court or by a duly authorized public officer. In many of the states, and in all other countries where the common law has prevailed, so far as we can ascertain, there must be a proceeding instituted—formerly a writ of escheat or inquest of office—in which either actual or constructive notice is given to all persons in interest before a judgment declaring the property to have been forfeited or to have escheated can be entered by a court. Here, Congress has undertaken to take the power of adjudication or ascertainment from the courts in whose hands the property is, and to whose credit it had been placed in a depository, and itself to exercise that power, making indeed not the "court" but the "judge" the person to execute its decree, ipso facto the lapse of a certain length of time, all without requiring notice to anybody (not even the parties to the suit) and without any power in the court to exercise any discretion, even though the litigation might still be in progress. To maintain this right it is contended that the United States, as parens patriæ, is entitled to have the court do what the statute in question has authorized. This proposition demands consideration, and none the less that it is altogether new as applied to any right of escheat in the United States outside of the territories and the District of Columbia. Under the feudal laws, the sovereign was the "father of the country," and, when there was a failure of heirs, land reverted to him by escheat upon taking certain steps, the initial one of which was an entry. In this country, at least, upon failure of heirs, the laws of escheat usually operate upon personal property as well as land, and questions arising under them have, in a few instances, come before the Supreme Court, and its opinions upon them will be noted.

It was held in the case of the Mormon Church v. United States, 136 U. S. 1, 57, 10 Sup. Ct. 792, 808, 34 L. Ed. 481, that the United States is parens patriæ in the territories, and the court observed:

"Chief Justice Marshall, in the Dartmouth College Case, said: 'By the Revolution, the duties, as well as the powers, of government devolved on the people. * * * It is admitted that among the latter was comprehended the transcendent power of Parliament, as well as that of the executive department.' 4 Wheat. 651, 4 L. Ed. 629. And Mr. Justice Baldwin, in McGill v. Brown, Brightly, N. P., 346, 373, a case arising on Sarah Zane's will, referring to this declaration of Chief Justice Marshall, said: 'The Revolution devolved on the state all the transcendent power of Parliament, and the prerogative of the crown, and gave their acts the same force and effect.' Chancellor Kent says: 'In this country, the Legislature or government of the state, as parens patriæ, has the right to enforce all charities of a public nature, by virtue of its general superintending authority over the public interests, where no other person is intrusted with it.' 4 Kent, Com. 508, note. In Fontain v. Ravenel, 17 How. 369, 384, 15 L. Ed. 80, Mr. Justice McLean, delivering the opinion of this court in a charity case, said: 'When this country achieved its independence, the prerogatives of the crown devolved upon the people of the states. And this power still remains with them except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment. The state, as a sovereign, is the parens patriæ.'"

The court also, in Hamilton v. Brown, 161 U. S. 256, 263, 16 Sup. Ct. 585, 587, 40 L. Ed. 691, et seq., having the law of Texas upon escheats under consideration, discussed the question in some of its phases, said:

"By the law of England, before the Declaration of Independence, the lands of a man dying intestate and without lawful heirs reverted by escheat to the King as the sovereign lord; but the King's title was not complete without an actual entry upon the land, or judicial proceedings to ascertain the want of heirs and devisees. Attorney General of Ontario v. Mercer, 8 App. Cas. 767, 772; 2 Bl. Com. 245. The usual form of proceeding for this purpose was by an inquisition or inquest of office before a jury, which was had upon a commission out of the Court of Chancery, but was really a proceeding at common law; and, if it resulted in favor of the King, then, by virtue of ancient statutes, any one claiming title in the lands might, by leave of the court, file a traverse, in the nature of a plea or defense to the King's claim, and not in the nature of an original suit. Lord Somers, in the Bankers' Case, 14 Howell's State Trials, 1, 83; Ex parte Webster, 6 Ves. 809; Ex parte Gwydir, 4 Maddock, 281; In re Parry, L. R. 2 Eq. 95: People v. Cutting, 3 Johns. 1; Briggs v. Light Boats, 11 Allen, 157, 172. The inquest of office was a proceeding in rem. When there was a proper office found for the King, that was notice to all persons who had claims to come in and assert them; and, until so traversed, it was conclusive in the King's favor. Bayley, J., in Doe v. Redfern, 12 East, 96, 103; 16 Vin. Ab. 86, pl. 1. In this country, when the title to land fails for want of heirs and devisees, it escheats to the state as part of its common ownership, either by mere operation of law, or upon an inquest of office, according to the law of the particular state. 4 Kent, Com. 424; 3 Washb. Real Prop. (4th Ed.) 47, 48."

On pages 267, 268, of 161 U. S., and page 589 of 16 Sup. Ct. (40 L. Ed. 691), the court used this language:

"These proceedings for the escheat of the estate of a deceased person for want of heirs or devisees, like ordinary proceedings for the administration of his estate, presuppose that he is dead; if he is still alive, the court is without jurisdiction, and its proceedings are null and void, even in a collateral proceeding. Griffith v. Frazier, 8 Cranch, 9, 23, 3 L. Ed. 471; Scott v. McNeal, 154 U. S. 34, 14 Sup. Ct. 1108, 38 L. Ed. 896; Hall v. Claiborne,

27 Tex. 217; Withers v. Patterson, 27 Tex. 491, 497, 86 Am. Dec. 643; Martin v. Robinson, 67 Tex. 368, 375, 3 S. W. 550; Caplen v. Compton, 5 Tex. Civ. App. 410, 27 S. W. 24. And if the death of the former owner, intestate and without heirs, is not alleged in the petition, or is not proved at the trial, a judgment for the state is erroneous, and reversible by appeal or writ of error. Hughes v. State, 41 Tex. 10; Wiederanders v. State, 64 Tex. 133; Hanna v. State, 84 Tex. 664, 19 S. W. 1008."

At page 269 of 161 U. S., and page 590 of 16 Sup. Ct. (40 L. Ed. 691), the court quoted with approval what had been said by the Court of Appeals of Texas, as follows:

"The proceeding while not strictly a proceeding in rem, has many of its characteristics; yet the statute does not direct a seizure of the thing, which, in some cases, has been held necessary to support a judgment strictly in rem. It applies to personalty, as well as realty. The mere institution of the proceeding creates no presumption that there is no one capable of taking the estate under the rules regulating the descent of estates of deceased persons; the presumption is to the contrary; and the effect of the judgment, if rendered after all persons interested in the estate are notified of the pendency and purpose of the proceeding, in the only manner in which they can be, if unknown, is to destroy that presumption, and to make the title of the state clear."

And in Bouvier's Law Dictionary there is a discussion upon this subject of escheats, from which we extract this paragraph:

"In this country, however, the state steps in, in the place of the feudal lord, by virtue of its sovereignty, as the original and ultimate proprietor of all the lands within its jurisdiction; 4 Kent, 424. See Matthews v. Ward, 10 Gill & J. 450; 3 Dana, Abr. 140. And it escheats to the state as part of its common ownership, either by mere operation of law, or upon an inquest of office according to the law of the particular state; Hamilton v. Brown, 161 U. S. 256, 16 Sup. Ct. 585, 40 L. Ed. 695; 3 Washb. R. P. (4th Ed.) 47, 48. It is, perhaps, questionable how far this incident exists at common law in the United States generally. In Maryland the lord proprietor was originally the owner of the land, as the crown was in England. In most of the states the right to an escheat is secured by statute; 4 Kent, 424; 1 Washb. R. P. 24, 27; (2d Ed.) 443."

These authorities inevitably lead to the conclusion that the national government is not in any case the parens patriæ to which ownerless property of any sort in any state of the Union reverts. We think that within the states respectively it is the state which exclusively is parens patriæ, and this result cannot be affected by the fact that the property might happen to be in the registry of a federal court. Though in the registry it is, nevertheless, a part of the general property in the state. The state, under the authorities cited, might with more plausibility be held to succeed to the title of such property, and might have the right through its escheator to apply to the court for it if any government be entitled to do so. In saying this we by no means intend to intimate that the state would, in fact, have the slightest right to an escheat of the money in court in this case. We only conclude, under the authorities cited, that if any government can claim to be parens patriæ it is that of the state, and not that of the nation.

It will also be remembered that the Constitution of the United States, which definitely fixes the rights surrendered by the states to the nation, makes no provision for escheats, and though article 3, § 3, gives Congress the power to declare the punishment of treason, yet, even as to

treason. it provides that no forfeiture of property shall be for more than "the life of the person attainted." Section 996, Rev. St., proposes much more, and that not for the high crime of treason, but for mere neglect or omission to claim what is one's own. Furthermore, escheats are always bottomed upon the fundamental proposition that an owner of property has died entirely without heirs. If any heirs are found, the escheat always fails. Section 996 does not proceed upon any notion that there are no heirs, nor does it make any provision for ascertaining the facts in the premises, but goes altogether upon a mere failure for 10 years to withdraw money from the court's registry, thus entirely ignoring the prime factor in escheats, namely, failure of heirs, and arbitrarily forfeits the money to the government. All that is necessary is the lapse of ten years. Now, there is nothing magical in the period of 10 years fixed in the statute. If that period may be fixed so may one of 5 years, or of 1 year, or of 1 month, and Congress might as well assume the judicial function, and, once for all, direct the court or the judge thereof to make any other order in a case; as one requiring money, under the control of the court, but payable ultimately to the persons entitled, to be paid over to the United States although the United States is not a party to the litigation, and shows no right to the money unless the statute ex proprio vigore confers it.

It is pointed out in the brief in support of the motion under consideration that in certain cases under the postal laws the government takes charge of property put into the mails and may sell it if, after, a long period, it is not claimed by any other person. But the Post Office Department is an executive branch of the government absolutely under congressional control, and whether provisions and regulations for such cases are valid or invalid as against the real owner of the property we are not called upon to decide, though it would seem, in the case before us, that Congress might quite as properly have required the judge or judges to make any specified order in a case in active litigation as to require them to turn over funds in the court's registries to the United States without any notice to persons in interest, and without any hearing or exercise of any judicial discretion in respect to the question, and only because Congress so required. We think that legislative and judicial functions under our form of government are something more separate and independent, each of the other, than such a contention would admit, but without going further into the discussion we conclude that the motion should be overruled, first, because it is made ex parte by one who is not a party to the suit, without any notice to those who have an interest in the fund sought to be taken for public uses, and without giving them, actually or constructively, any opportunity to be heard in opposition thereto; second, because the money sought to be thus escheated to the United States manifestly belongs either (a) to the unknown holders of the 842 mortgage bonds issued by the defendant, or (b) to those bondholders who have presented their bonds, and whose debts for the most part remain unpaid, or (c) to the general creditors, if any, or else (d) to the holders of the capital stock of the Grand Rivers Company; third, because to transfer the title to the money from the true owners to the United States without any process of law or

any compensation would violate the fifth amendment to the Constitution of the United States; fourth, because we greatly incline to think that as to the property in question the state of Kentucky, and not the United States, would be parens patriæ, differing in this respect from a case where the property is in one of the territories of the United States or in the District of Columbia, over each of which the powers of Congress are plenary; and, fifth, because we greatly doubt whether the courts should yield to the view that Congress, by legislation, can direct what order a court shall enter in respect either to money in its registry for other purposes or in respect to any matter involved in any suit—such matters being judicial rather than legislative in character.

Besides, it may be stated that in many instances claimants have appeared and got their money out of the court's registry much longer than 10 years after it had been put there. This they could not have done if the money had been transferred and paid over to the United States, as contemplated by the amendment to section 996. An act of Congress appropriating money for the purpose would then have been necessary to enable the person entitled to it to get it, and no one can say what Congress would have done or would do in such a case, nor the obstacles which any member might interpose. Money once in the Treasury is under the uncontrollable power of Congress, and what that body may do with it is matter of grace or discretion. Certainly Congress could not be controlled by the courts, once they had surrendered to the government money held in trust for litigants.

Doubtless many balances are left indefinitely in banks which have been designated as depositories, and in that way they get the use of this money as they do of their other deposits. The national Treasury might get that advantage (and it has been urged that it should) in preference to the banks were it not that the courts are warned by the very legislation we are considering that at some departmental suggestion Congress might pass an act which would prevent the Treasury from honoring the court's draft upon its own funds, in which event the court and the persons fairly entitled to those funds would be altogether powerless. But for this we have no doubt that every federal court would prefer, in its discretion, to place in the Treasury to the credit of the court and subject to its orders all old balances which apparently have been forgotten by those entitled to the money, thus making the Treasury the court's banker as to such funds. However, funds thus deposited would by no means become public property, and should not be regarded or treated as such by any officer or person. But this course the courts will probably hesitate to pursue until definitely assured that the danger referred to is altogether removed by specific legislation to that effect.

The motion will be overruled.