## EQUITABLE TRUST CO. OF NEW YORK v. WESTERN PAC. RY. CO. et al. (CENTRAL TRUST CO. OF NEW YORK et al., Interveners).

(District Court, N. D. California. November 21, 1923.)

No. 169.

Railroads ⊕⧉197—Bondholders purchasing property with bonds, and nonparticipating holders presenting bonds, held not entitled to share in interest on moneys apportioned to holders not presenting bonds.

Where railroad was sold on foreclosure to a group of bondholders, who received the property in satisfaction of their bonds, the participating bondholders and other bondholders, who had presented their bonds and received moneys apportioned to them, were not entitled to share in ac-

cumulated interest on moneys apportioned to nonparticipating bondholders, who had not presented bonds for payment of their proportionate share.

In Equity. Suit by the Equitable Trust Company of New York, as trustee, against the Western Pacific Railway Company and others, in which the Central Trust Company of New York, as trustee, intervened. On petition for distribution of money in hands of the special master. Judgment rendered.

Jared How, of San Francisco, Cal., and Murray, Prentice & Howland, of New York City, for complainant.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for minority bondholders.

M. A. Thomas, of San Francisco, Cal., for special master.

F. M. Angellotti and C. W. Dooling, both of San Francisco, Cal., for intervener Drascovich.

FARRINGTON, District Judge. The Western Pacific Railroad Company issued two series of bonds, the first for $50,000,000, and the second for $25,000,000, altogether $75,000,000. In 1916 the property of the company was sold in foreclosure proceedings for $18,000,000. The purchasers were a group of bondholders who owned or controlled about 95 per cent. of the first bond issue. In pursuance of a court order, dated July 1, 1916, 48,989 first mortgage bonds, having a face value of $47,301,600, and cash to the amount of $1,373,487.60, were delivered to the special master in exchange for a deed to the property. The cash was deposited in bank, and prior to October 28, 1916, it had earned $5,430.31 interest; the rate allowed was 3 per cent. per annum on $425,000 set aside to cover expenses, and 2 per cent. per annum on the undrawn remainder reserved for the payment of bonds not utilized in purchasing the railroad. Interest on the deposits subsequent to October 28, 1916, and prior to September 25, 1923, amounted to $19,262.33, and the total amount of cash received by the special master prior to the last date was $1,398,180.24. In an order dated October 11, 1916, the court found: (1) That $144,483.26, in excess of the amount due from the purchasers of the railroad, had been collected, and ordered the same returned; (2) that $17,727,725.55, that is, 35.455451 per cent. of the face amount of the first mortgage bonds was the total amount applicable to the payment of such bonds; (3) that $10,000 should be paid to Pillsbury, Madison & Sutro for services as attorneys for bondholders not participating in the purchase of the road, and that this amount should be deducted from their share of cash in the hands of the master; and that there should be paid a sum equal to 35.084861 per cent. of the face amount of such bonds to the holders on presentation. The face value of the nonparticipating bonds referred to was $2,698,400, and the number of such bonds was 2,846. It was also ordered that interest on the $144,483.26, amounting to $1,089.54, should be paid to the purchasers of the road, and that to the percentage awarded the nonparticipating bondholders there should be added and paid such interest as should have accrued on their moneys while in bank under control of the special master prior to October 28, 1916.

299 F.—20

The master's disbursements have been as follows:

1. Excess cash to Western Pacific Company....................$144,483.26
2. Revenue tax on deed.......................................  14 948.90
3. Receivers  ...............................................  70,000.00
4. Receivers' attorneys  ....................................  71,056.71
5. Complainant  .............................................  37,469.00
6. Complainant's attorneys  .................................  70.222.94
7. Attorneys for nonparticipating bondholders...............  10,000.00
8. Premium on receiver's bond, etc..........................   1,576.90
9. Payment on 2,815 bonds................................... 935,640.53
10. Accumulated interest to October 28, 1923, paid to holders of
     said bonds at 2 per cent. per annum.....................   3,073.16
11. Interest to Western Pacific Company on item 1, accumulated
     prior to October 28, 1916, at 3 per cent. per annum.........   1,089.54
12. Expenses from October 28, 1916............................   1,620.55

                                                            $1,361,181.49

The balance remaining in the hands of the master September 25, 1923, is $36,998.75. Of this amount $7,000 is reserved for the special master under a court order filed August 29, 1916; $11,150.96 is held for 31 bonds not yet presented, and includes $64.44 interest accumulated prior to October 28, 1916. Deducting these amounts from the total in the hands of the master, there is a balance of $18,847.79. It is suggested that the $11,150.96 held by the master to pay on 31 bonds not yet presented should be deposited in a United States depository to the credit of the owners, and to this no one has thus far objected.

The problem presented to the court is to dispose of the interest amounting to $18,847.79, earned and accumulated on the proceeds of the foreclosure sale after coming into the hands of the master. Out of this interest, the special master asks $5,000 as additional compensation for himself, and $1,000 for his attorney, M. A. Thomas. The complainant, the Equitable Trust Company of New York, asks that Jared How, its attorney, be allowed further compensation to the amount of $3,500. In all, $9,500 out of a fund of $18,847.79 is asked. The court is also urged to distribute the residue pro rata among all bondholders who have presented their bonds for payment. If these requests are granted, the bondholders, to whom was apportioned the money which earned this interest, will probably receive less than $450. The equity of such a distribution is not apparent, and of necessity those who advocate it must find their justification in the assumption that the accumulated interest is a fund in which all bondholders have a common interest, and to which each has a right proportionate to the face value of the bonds held by him. Accordingly it is contended that:

"No proportion of the money in court becomes vested in and belongs to any bondholder until he shall have presented his bond for payment and stamping, and that in the event that he shall not present his bond, the money which would otherwise be due to him never passes from the common fund. * * * Interest accrued upon the common fund becomes inevitably a part of the common fund, and inasmuch as it has not been disposed of by the court, it now remains for the court to distribute such balance of it as remains after the payment of the expenses of the administration of the fund, to all bondholders of record pro rata."

Two cases have been cited. In the first, American Loan & Trust Company v. Grand Rivers Company (C. C.) 159 Fed. 775, about 14

years after the foreclosure sale, $1,140 still remained unclaimed by bondholders who were entitled to receive it. The United States District Attorney moved that, in accordance with the Act of February 19, 1897 (29 Stat. 578), it be paid into a United States depository to the credit of the United States. This motion was denied. It was held that the statute was unconstitutional, as it tended to deprive an owner of his property without due process of law, and that such a disposition of the money would defeat the purpose of the trust for which the money was paid into court, namely, to pay it to the bondholders entitled to share therein. The court was of the opinion that, if the act were followed, the owners could not recover their money without a special act of Congress, and that the unclaimed balance should be redistributed to bondholders who had already appeared.

In the second case cited, Brown v. Pennsylvania Canal Co. (D. C.) 274 Fed. 467, there was a suit to foreclose a mortgage brought by one bondholder in which others were permitted to intervene. After the lapse of some years, $30,000 remained unclaimed. Following the American Loan & Trust Company decision, a petition was filed asking that the $30,000 be redistributed to the bondholders who had appeared and received their shares of the proceeds of the foreclosure. This petition was denied, and the denial was later sustained by the Circuit Court of Appeals. 279 Fed. 417, 418. The appellate court made no attempt to distinguish the two cases, but based its conclusion on the following reasons, which seem to be not only convincing, but unanswerable:

"The burden certainly rested on the petitioning bondholders to show a right on their part to the pro rata share of the fund which belonged to their fellow bondholders. They have not done so, and we are therefore unable to see by what means the ownership of the nonappearing bondholders was transferred or forfeited to those who did appear. We are shown by the provisions of the mortgage no interest one set of bondholders had in the bonds of another set of bondholders. To start with the premise that the court was administering a trust fund, and that it was payable to those cestui que trustents only who appeared when it was distributed, begs the whole question. Indeed, if the trust fund theory be urged, it will be seen that the trust imposed on the court was to hold and distribute to each bond, and therefore for each bondholder, the pro rata payable to it or him. Certainly no such trust as is here contended for was expressed in the mortgage, and we see no ground for implying one."

The features in which the two decisions differ are: (1) The suit was brought by the trustee for all the bondholders in the first case; in the second, the suit was brought by one of the bondholders, and others were permitted to intervene. (2) The federal statute (Rev. Stats. § 996) had been so amended when the decision in the second case was rendered that such funds could be paid into a United States depository, where they would be regarded as permanently appropriated for the purposes of the trust, and would be paid to the rightful owner when claimed. It is argued that, inasmuch as the suit was brought by a trustee, the proceeds of the foreclosure sale constituted a common fund, and that, notwithstanding the order of the court directing that the net proceeds be distributed pro rata among the bondholders according to their holdings, no right or ownership accrued to any bondholder until he had presented his bond for payment. In the second case the suit

was not brought by the trustee, but by one of the bondholders. Other bondholders were permitted to intervene; hence it is contended the proceeds did not constitute a common fund, but the pro rata shares therein vested and became the property of each bondholder, whether he presented his bond or not.

I prefer to think that the reason controlling the court in the first decision was not the fact that the action had been brought by the trustee, and resulted in a judgment for one sum, later to be distributed among the various bondholders, and that this constituted a common fund, which the court was at liberty to distribute to one set of bondholders to the detriment of another. A small sum of money, due to a few bondholders, had remained unclaimed nearly 14 years in custody of the court. It was not likely that all, or even a considerable number, of the bonds would ever be presented. The petition to turn the money over to the United States, had it been granted, would have resulted in escheating the money to the government. There were many and obvious objections to depositing it indefinitely in bank. The only other method available to end the trust was to distribute the $1,140 among the creditors who had appeared.

Counsel argue that the question as to how the accumulated interest ought to be disposed of should be solved by determining whether such interest is a general or a particular fund, and whether by the order of October 11, 1916, the money ordered to be paid to the bondholders as of October 28, 1916, vested in them absolutely as of that date, or whether the vesting was postponed until they presented their bonds for payment and accepted the pro rata share ordered. The interest can be regarded as a common fund only on the theory that it was earned by money which was itself during the earning period a common fund. It is difficult to understand how it could be a common fund owned by all the bondholders, if the principal sums on which it was earned were owned and had vested, not in all, but only in a small group, of bondholders, while the interest was accumulating.

All parties are apparently satisfied that the $11,150 should be turned into the United States treasury in trust, to be paid, when demanded, to the owners of the 31 bonds still unclaimed. Why this sum is not quite as much a part of a common fund as the interest it has earned since October 28, 1916, is not explained. By the order of October 11, 1916, the amount which each bondholder, on presentation of his bonds, was entitled to receive, was precisely ascertained and fixed, and if all the bondholders had presented their bonds October 28, 1916, the net proceeds arising from the foreclosure sale of the debtor's property would have been completely exhausted. No one will contend that, after bondholder A. received his share October 11, 1916, he had a right to demand that bondholder B.'s share should remain in bank to accumulate as interest a common fund to be shared by bondholder A. Whether bondholder B.'s share remained in bank or not was absolutely optional with bondholder B. If he demanded it October 28, 1916, or at any time thereafter, the master himself had no power to withhold it, or any part of it.

There is nothing in the reasoning of the American Loan & Trust Company Case, supra, nor has my attention been called to any provi-

sion of the mortgage in this case, which requires that the interest earned by the money of one set of bondholders who have appeared and presented their bonds should be distributed, in whole or in part, among another set of bondholders, whose money, or share in the proceeds of the foreclosure, was not in the hands of the master, or at most was not in his hands for a sufficient time to earn any of the interest. The bondholders who participated in purchasing the railroad received that property in 1916 in satisfaction of their bonds, and of their share of the sum for which the railroad was sold. During more than seven years they have enjoyed the use of the property, its dividends, if any, the appreciation in the value of the road, and the profit which was made, if any, in purchasing it for $18,000,000. It is impossible to discover any just or equitable reason why, in addition, they should now be permitted to receive 95 per cent. of the interest earned during the same seven years by moneys set aside for the payment of bondholders who did not join in buying the road.

The suggestion that the court declared the bonds should draw no interest after October 28, 1916, is beside the issue. That order was intended to accelerate presentation of bonds to the special master. There was no thought of transferring future accumulations of interest on delayed payments, or on unclaimed shares of the money, into a common fund. The interest now in question is not the interest on the bonds; it is not money due from the defendant company; it is interest which has accrued on moneys in bank after they had been apportioned to certain bondholders. The interest of the nonappearing bondholders cannot be transferred to the bondholders who have appeared, unless the latter can show a right on their part to the shares belonging to the former. My attention has not been called to any provision in the mortgage which shows that any one set of bondholders has an interest in the bonds of another set of bondholders.

The petition to distribute the accumulated interest among all the bondholders, in so far as it applies to those who participated in purchasing the railroad, and in so far as it includes those who presented their bonds and received the moneys apportioned to them on or before October 28, 1916, must be denied.

As the nonparticipating bondholders are represented by Messrs. Pillsbury, Madison & Sutro, who have already received $10,000 for their services, and as these bondholders object to the payment of any additional fee out of their moneys to Jared How, the petition of the Equitable Trust Company of New York for an additional attorney's fee to Mr. How must be denied.

No objection has been offered to allowing $1,000 compensation to M. A. Thomas, attorney for the master. The master, by court order filed August 29, 1916, was allowed a compensation of $7,000, to be paid only when his services were fully performed. He now asks $5,000 additional, or $12,000 all told. In support of his demand it is urged: (1) That it was not contemplated that errors would be found in the list of bondholders furnished by the Equitable Trust Company, the trustee; (2) that the administration of the trust has been continued for a great length of time; and (3) that the purchasing power of the $7,000 is

much less now than in 1916. The answer is that it would be somewhat unusual if errors were not made in preparing a list covering a bond issue of $50,000,000. And again, in the case of Brown v. Pennsylvania Canal Co., supra, the trust fund remained in the custody of the court almost as long, and in the case of American Loan & Trust Co., supra, much longer than in the present case. Furthermore, section 996 of the Revised Statutes in its present form was adopted March 3, 1911 (Comp. St. § 1645); hence it was possible for the master to have asked to be relieved of his trust long before the present petitions were filed.

Tested by other fees allowed in this litigation, it is not apparent that $12,000 would be unreasonable, but the order of August 29, 1916, fixing the master's compensation at $7,000, was based on an agreement between interested parties. The duration of the trust and errors in the list of bondholders, while they may not have been in actual contemplation of the parties at the time the order was made, would certainly have been suggested as strong probabilities by the most cursory examination of the history of similar litigation. Again, it would be inequitable to impose the payment of so large a portion of the master's compensation for services performed in the interest of all the bondholders on so few of them. However, the fact cannot be overlooked that the distribution of the fund now in the master's hands will involve no small amount of work, for which $1,500 will not be unreasonable compensation. This amount can be paid without drawing on the interest earned by moneys apportioned to the bondholders. $5,430.31 interest was accumulated prior to October 28, 1916. Of this sum $3,073.16 was paid on bonds presented for payment; $1,089.54 was paid to the Western Pacific Company as interest on the $144,483.25, excessive amount given to the master on purchase of the road; $64.44 was reserved as interest on bonds not yet presented. The remainder, $1,203.17 interest, was earned by moneys not specially set aside for the bondholders. This amount, and $7,000 held for compensation of the master to be paid on completion of his trust, has been on interest until the present time, and cannot be regarded as interest earned on moneys set apart to pay the bondholders.

From the balance in his hands the special master will reserve $8,500 for his own compensation, and $1,000 for M. A. Thomas, his counsel, both sums to be paid on completion of his trust. He is authorized to publish a suitable notice of the distribution of such money in three papers, to be selected by himself as most likely to give notice to the largest number of interested parties. The reasonable cost of this, and other necessary court costs, and costs of distribution and closing his trust, he will deduct from and pay out of the balance remaining in his hands. The $11,150.96 remaining unclaimed in the master's hands will be paid to those entitled thereto under the order of October 11, 1916, if they appear or can be found. January 1, 1924, is hereby fixed as the date for paying them, and the bondholders whose shares of the net proceeds of the foreclosure sale, as fixed and as ascertained by the order of October 11, 1916, earned interest after October 28, 1916. The remainder will be distributed among the bondholders last mentioned, if they appear or can be found before March 1, 1924, giving to each a

sum proportionate to, but not exceeding, the interest earned on his share of said proceeds after October 28, 1916, and before January 1, 1924. The remainder of the fund in his hands on the 1st day of March, 1924, including the then unclaimed portion of said $11,150.96, the special master is hereby directed to deposit on that date in the treasury of the United States, in the name and to the credit of the United States, together with the name, description, and residence, so far as known, of each person or corporation entitled to receive the same, or any portion thereof, to be held and disbursed by the United States in accordance with the provisions of section 996 of the Revised Statutes of the United States, as amended by the Act of March 3, 1911 (36 Stat. c. 224, p. 1083 [Comp. St. § 1645]).

On filing proof of compliance with this order and the order of October 11, 1916, and approval thereof by the court, the special master will be entitled to his discharge and exoneration of his bond.