JOSEPH H. GRAY, trustee, *vs.* CENTRAL MASSACHUSETTS RAILROAD COMPANY, appellant.

Suffolk.   December 14, 1897. — May 19, 1898.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Trust Mortgage — Title to Fund — Railroad Lease — Construction of Indenture — " Property."*

A railroad corporation gave a mortgage of its property to trustees to secure the payment of an issue of bonds. This mortgage was subsequently foreclosed, and the property bought in at the sale by a committee acting for a portion of the bondholders, under an agreement and statutory authority. In accordance therewith the corporation was reorganized, and a portion of the former bondholders took preferred stock in the new corporation, in exchange for their bonds in the old corporation. The purchasing committee paid on account a certain sum, which was received and held by the trustees, who, upon a confirmation of the sale by a decree of court, conveyed the property to the committee, who then conveyed it to the new corporation. Coupons to a large amount were in litigation until nine years later, when they were all obtained and cancelled. *Held*, that the right to the fund so held by the trustees did not revert to the committee, but passed to the new corporation.

An indenture of lease, executed by two railroad corporations, contained the following clause: "The lessor doth hereby grant, demise, and lease unto the lessee its railroad and railroad property of every description, both as the same now

exists and it shall exist after the location, construction, completion, and equipment of said railroad from C. to N. as herein provided, and the location, construction, and equipment of said branch or extension of said railroad as above specified, including therein its railroad, lands, and all real estate, rights, and appurtenances connected therewith, within this Commonwealth; also all branches, tracks, side tracks, and the land on which the same are located, roa beds, superstructure, gravel pits, station-houses, depots, viaducts, bridges, piers, wharves, shops, buildings, fixtures, water tanks, engines, tools, cars, rolling stock, machinery, furniture, telegraph apparatus, poles, and equipments of every kind, material and supplies, and all personal property and estate owned by said lessor; also all rights, franchises, and easements, privileges, and appurtenances belonging to said lessor in connection with said railroad, together with the right to fix, demand, and receive all tolls, rent, revenue, income, and profits of the demised railroad and premises, and the right to run, manage, and control the same, subject to the provisions of its charter and of the laws of this Commonwealth." *Held,* that the right which the lessor had in a fund received by the trustees under a mortgage of the railroad property given by its predecessor to secure the payment of bonds, from a committee of the bondholders purchasing at a foreclosure sale, passed to the lessee under the clause above quoted.

APPEAL from a decree of the Probate Court, ordering that the balance of a trust fund in the hands of the appellee, less any proper deductions, be paid to the Boston and Maine Railroad, together with all interest accrued thereon.   The case was submitted to this court, and, after a decree affirming the decree of the Probate Court, to the full court, on appeal, upon agreed facts, in substance as follows.

On January 1, 1880, the Massachusetts Central Railroad Company issued certain bonds, to secure the payment of which it gave a trust deed or mortgage of its property to three trustees.

This mortgage was subsequently foreclosed, and the property was bought in at the foreclosure sale in May, 1883, by persons acting as a committee of the bondholders, under a memorandum dated January 20, 1883, and under St. 1883, c. 64.   In accordance therewith the railroad corporation was thereupon reorganized as the Central Massachusetts Railroad Company, and all the former bondholders except one took preferred stock in the new corporation in exchange for their bonds in the Massachusetts Central Railroad Company.

The price bid for the property by this committee at the foreclosure sale was $500,000, and the sum actually paid in cash was $20,000, which was paid into court, the rest of the purchase money being ultimately paid by surrender of the bonds of the Massachusetts Central Railroad Company.   This fund of $20,000

was deposited by the trustees in a bank in their names as trustees. The sale was confirmed by a final decree of the Supreme Judicial Court on November 17, 1883, declaring the mortgage foreclosed, but making no order as to a distribution of the proceeds of the sale; and thereupon the trustees conveyed the property to the bondholders' committee, and this committee in turn conveyed to the new corporation on November 24, 1886. Coupons to the amount of some $150,000 were in litigation until 1895, when the same were all obtained and cancelled.

The new corporation, now reorganized as the Central Massachusetts Railroad Company, leased its property, both real and personal, to the Boston and Lowell Railroad Corporation on December 7, 1886.

The indenture of lease, after reciting that the lessor was desirous of completing and equipping its railroad, which had been located and partially constructed, and of leasing the same so completed and equipped to the lessee for a term of years, and the lessee desired to aid the lessor in constructing the railroad by taking its bonds, provided that the lessor should forthwith issue, sell, and deliver to the lessee its first mortgage coupon bonds to the amount at par value of two millions of dollars; that after such sale and delivery of the bonds, and as the full price therefor, the lessee should pay and discharge all certificates of indebtedness issued to and held by it under the contract then existing between the parties to the indenture, and by virtue of St. 1885, c. 329, amounting to $200,000, and should discharge any other liabilities or encumbrances necessary to be removed in order to confirm the title of the trustees of the mortgage securing the bonds so issued, such liabilities and encumbrances to be established to the satisfaction of the lessee and not to exceed $150,000; that the lessee should retain in its hands the price to be paid for the bonds, and the same should be applied to the payment of the sums agreed to be paid in the contracts for the construction and equipment of the railroad, and for the payment of the certificates of indebtedness, land damages, and liabilities and encumbrances to confirm the title; and also provided as follows: "The lessor doth hereby grant, demise, and lease unto the lessee its railroad and railroad property of every description, both as the same now exists and it

shall exist after the location, construction, completion, and equipment of said railroad from North Cambridge to Northampton, as herein provided, and the location, construction, and equipment of said branch or extension of said railroad as above specified, including therein its railroad, lands, and all real estate, rights, and appurtenances connected therewith, within this Commonwealth; also all branches, tracks, side tracks, and the land on which the same are located, roadbeds, superstructure, gravel pits, station-houses, depots, viaducts, bridges, piers, wharves, shops, buildings, fixtures, water tanks, engines, tools, cars, rolling stock, machinery, furniture, telegraph apparatus, poles, and equipments of every kind, material and supplies, and all personal property and estate owned by said lessor; also all rights, franchises, and easements, privileges, and appurtenances belonging to said lessor in connection with said railroad, together with the right to fix, demand, and receive all tolls, rent, revenue, income, and profits of the demised railroad and premises, and the right to run, manage, and control the same, subject to the provisions of its charter and of the laws of this Commonwealth."

The indenture provided further that the demised property was to be held for the term of ninety-nine years; that the lessee should " take possession of said railroad and premises as soon as this lease is signed, and, after taking possession of said railroad and premises, under the terms of this lease," the lessee should pay to the lessor rent for the leased premises, the rent to begin as soon as any bonds should be issued, and to be a sum sufficient to pay the interest on the bonds, and when the railroad had been constructed the rental was to be a certain percentage of the gross receipts from the operation of the railroad; that the lessee should at the end of the term "surrender the demised real and personal estate in the like good order and condition in which they are received by the lessee, or may be put during the term by the lessor"; that "to prevent uncertainty as to the property herein demised and to be accounted for upon the termination of this lease, and as to its condition when delivered to this lessee, there shall be made at the time of such delivery a full, complete, and particular inventory, description, and appraisal of all the estate, real and personal, belonging to the lessor, and coming

into the possession of the lessee by virtue of this lease "; and that the "lessor hereby authorizes said lessee, at its discretion, to sell and dispose of such of the rolling stock, equipment, and such other personal property herein demised as said lessee may deem advisable, and to remove and take down at its discretion such buildings, structures, and fixtures as it shall deem prudent, and to dispose of the same; . . . and said lessee agrees to replace such rolling stock, fixtures, and buildings with other improvements and property of like kind and equal value, and in case such property is not replaced to account for its value to said lessor."

The Boston and Lowell Railroad Corporation thereafter leased its road, and all property held by it under the lease, to the Boston and Maine Railroad. Both of these two leases are now in force.

The balance of cash paid by the committee of bondholders to the trustees at the foreclosure sale above referred to constitutes the fund in controversy. Certain deductions for expenses and charges have been made, so that it now amounts to $13,405.17. The original trustees have all died since the reorganization, and the appellee holds the fund as their successor under a decree of the Probate Court. The appellee claims no interest in the fund, and the purchasing committee of the bondholders has filed a disclaimer authorizing its payment to the Central Massachusetts Railroad Company. The only question is between the Boston and Maine Railroad, which claims by virtue of the lease of the Central Massachusetts Railroad Company to the Boston and Lowell Railroad Corporation, and the subsequent lease of the Boston and Lowell Railroad Corporation to the Boston and Maine Railroad, and the Central Massachusetts Railroad Company, which claims that the fund in question did not pass under the terms of its lease. No claim is made by any intervening parties, and the fund belongs to the Central Massachusetts Railroad Company, unless it passed to the Boston and Maine Railroad by virtue of the leases above referred to.

At the time of the lease of the Central Massachusetts Railroad Company to the Boston and Lowell Railroad Corporation, the former corporation had no funds or securities other than the fund in controversy, and its principal or only other assets con-

sisted of its roadbed and track partially constructed, and some rolling stock.   The road has since been completed by the Boston and Lowell Railroad Corporation and the Boston and Maine Railroad, and is now in active operation.   If the fund in question passed to the Boston and Lowell Railroad Corporation under the terms of this lease, it is admitted that it passed from that corporation to the Boston and Maine Railroad.

*S. Lincoln*, (*H. W. Ogden* with him,) for the Boston and Maine Railroad.

*G. W. Morse & C. H. Innes*, for the Central Massachusetts Railroad and the committee of the bondholders.

BARKER, J.   The claim of the Massachusetts Central Railroad Company under the alleged right and authorization of the committee of the bondholders cannot be sustained.   The twenty thousand dollars which was the source of the fund was paid into court by a purchasing committee, and was received by the original trustees on account of the purchase price of mortgaged property sold by them as vendors under a power of sale, at a foreclosure sale which was affirmed by a final decree declaring the mortgage foreclosed.   When the money was so paid and received as a part of the purchase price it became the property of the mortgage trustees, and there is nothing in the agreed statement of facts which requires a finding or a ruling that the sum so paid, or any part of it, afterward reverted to the committee.

The sale was part of a scheme for the reorganization of the Massachusetts Central Railroad Company, which then had an unfinished railroad, mortgaged to the trustees to secure an issue of bonds, the interest upon which was then overdue, and the committee was acting for the holders of a portion of the bonds under a memorandum dated January 20, 1883, and also under the provisions of St. 1883, c. 64, by which they were empowered to purchase the mortgaged property upon foreclosure sale, and to hold it in trust for the bondholders, but absolutely in fee, and free from every right and equity of redemption of the mortgagor.   At the time of the sale all of the bondholders had not come into the scheme, and the whole debt represented by the bonds and coupons was not brought in until the year 1895.   The trustees had to rely upon the proceeds of the sale to reimburse themselves for the expenses of the sale, and also to discharge

the obligations of their trust to such bondholders as should not consent to extinguish their bonds by taking preferred stock in the reorganized company. The purchase price at the sale was $500,000, of which the $20,000 only was paid in cash.

If the whole mortgage debt had been represented by the committee at the time of the sale, and there had been some fund other than the purchase price out of which the expenses of the mortgage trustees could be paid, the purchasers at the sale might have paid into court a sum to secure the completion of the reorganization, and to be returned to them upon the extinguishment of the mortgage debt by the issue to the bondholders of preferred stock in the reorganized corporation. But the real situation at the time of the sale required the offer of a substantial price, which would enable the mortgage trustees to discharge their obligations in respect to that part of the mortgage debt whose holders had not then agreed, and might not agree, to surrender it for preferred stock. So the committee bought for the price of $500,000, and paid the $20,000 as a part of that price, and the mortgage trustees received the part paid in cash, not as a pledge or as collateral, but as an asset of their trust. That the committee did not pay the balance of the purchase money, and that the whole mortgage debt has since been extinguished, do not cause that part of the purchase money which was in fact paid to revert to the purchaser. The committee released to the new corporation, on November 24, 1886, the property which they had bought at the foreclosure sale in May, 1883. The reason why this fund remained untouched after deducting the expenses of the foreclosure sale was no doubt the fact that, until the last of the mortgage debt was obtained and cancelled in 1895, the fund was held primarily in trust to pay that debt. If the mortgage debt should be wholly extinguished without recourse to the fund, the fund would go to the mortgagor or its successors or assigns ; the right to the fund subject to the prior rights of the holders of the mortgage debt being as of course in the mortgagor. But by the reorganization which was authorized by St. 1883, c. 64, and was completed before the committee's release of November 24, 1886, the Central Massachusetts Railroad Company had become the legal successor of the mortgagor, and so was the owner of the beneficial interest

in this fund, subject only to the prior claims of the holders of so much of the mortgage debt as had not then been extinguished. The bondholders' committee were never the full successors of the mortgagor, either before their purchase or after becoming by means of the purchase the trustees to hold in fee the title to all the property which they had purchased; but the reorganized corporation is such a successor, and it obtained its title to the fund, not through the sale, but from the mortgagor through the reorganization.

The remaining question is whether the right which the Central Massachusetts Railroad Company had in the fund on December 7, 1886, passed to its lessee under the demise contained in the indenture of that date. Whether the original trustees were then living does not appear, but the fund was then deposited in their names as trustees under the mortgage in the bank in which it yet remains. The first claim upon it at that time was a portion of the mortgage debt spoken of in the agreed statement as " coupons to the amount of some $150,000," which are also said to have been in litigation until 1895, when they were all obtained and cancelled. It is therefore plain that at the time of the indenture the lessor's right in this fund was not money or cash, but was an equitable right the value of which was wholly contingent and uncertain, which would not probably be reduced into money payable to the lessor, if at all, until the whole mortgage debt should be otherwise extinguished.

The demising clause of the indenture is as follows: "Lease of all property. The lessor doth hereby grant, demise, and lease unto the lessee its railroad and railroad property of every description, both as the same now exists and it shall exist after the location, construction, completion, and equipment of said railroad from North Cambridge to Northampton as herein provided, and the location, construction, and equipment of said branch or extension of said railroad as above specified, including therein its railroad, lands, and all real estate, rights, and appurtenances connected therewith, within this Commonwealth; also all branches, tracks, side tracks, and the land on which the same are located, roadbeds, superstructure, gravel pits, station-houses, depots, viaducts, bridges, piers, wharves, shops, buildings, fixtures, water tanks, engines, tools, cars, rolling stock, machinery, furniture,

telegraph apparatus, poles, and equipment of every kind, material and supplies, and all personal property and estate owned by said lessor; also all rights, franchises, easements, privileges, and appurtenances belonging to said lessor in connection with said railroad, together with the right to fix, demand, and receive all tolls, rent, revenue, income, and profits of the demised railroad and premises, and the right to run, manage, and control the same, subject to the provisions of its charter and of the laws of this Commonwealth."

While the whole indenture, with the situation of the parties and the circumstances under which the indenture was entered into by them, is to be taken into account in construing the demising clause, the language of that clause itself is the first and principal subject of consideration. After the words, " The lessor doth hereby grant, demise, and lease unto the lessee," the clause contains three co-ordinate sub-clauses, the second and third of which begin with the words " also all." The first designates as demised the lessor's railroad and railroad property of every description, both as it then existed and as it should exist after the contemplated completion and equipment of the railroad and its branch or extension by the lessee. The second designates as demised also many particular classes of things, some of which would clearly be parts of or included in the railroad property already designated, and others of which as " furniture," " material," and " supplies," might not be railroad property in any sense other than that they would be owned by a railroad company, and this sub-clause ends with the words, " and all personal property and estate owned by said lessor." The third sub-clause designates as demised also all rights, franchises, easements, privileges, and appurtenances belonging to the lessor in connection with said railroad, together with the right to take tolls, rent, revenue, income, and profits, and the right to operate the railroad.

The construction for which the appellant contends is that the words, " and all personal property and estate owned by said lessor," are not part of a clause designating additional subjects of the demise, and that they are governed by the prior word " including," and should be restricted so as to include only such property, not already specified, as is in its nature distinctively

railroad property.  But the whole clause as it stands does not seem to us to bear this interpretation.  We think the words, " including therein its railroad, lands, and all real estate, rights, and appurtenances connected therewith, within this Commonwealth," are the end of one distinct part of the whole clause, and that the words which follow relate back directly to the words " grant, demise, and lease," and that the things described and designated in this clause are demised simply by force of being named therein, and not as included in something previously demised, and in the same way in which the franchises and the rights to tolls and to operate the railroad and the other rights designated in the third sub-clause are treated as distinct subjects of the demise, although some of them would have passed to the lessee as appurtenant to the demise of the railroad and its lands and real estate.  That there is repetition in the different sub-clauses does not tend to show that the only office of the language of the second or the third clause is more clearly to designate what was meant to be covered by the first.  We think that as it is written the whole demising clause was intended to demise all of the lessor's property and rights which were fairly included in the language of any part of the clause.

Such a right as that of the lessor to the fund in question was clearly personal property owned by the lessor, since the word " property " extends to every species of valuable right and interest.  *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1, 35.  *Williston Seminary* v. *County Commissioners*, 147 Mass. 427, 430.

This meaning of the demising clause will stand as its true construction, unless the other parts of the indenture taken with the situation and circumstances of the parties show that it is untenable, and that it could not have been the intention of the parties.  After considering all that has been urged by the appellant in this connection, we are not convinced that the parties did not intend that the right of the lessor to this fund should pass by the demise.  The indenture was much more than a mere lease.  It was part of an arrangement by which the lessor's railroad should be completed and equipped by the lessee, and operated by it until the expiration of ninety-nine years, and by

which also the lessor's debts of $250,000 in certificates of in-debtedness held by the lessee, and the lessor's other debts and liabilities not exceeding $150,000 in amount, should be extinguished by the lessee, out of the two million of bonds at par which the lessee purchased of the lessor, and the balance of which was to go to the completion and the equipment of the railroad.

It is true that the lessor's debts outside of the certificate of indebtedness might exceed the sum of $150,000, but it does not appear that they did exceed that sum, and it is also clear that, if they did exceed it, there was no probability that the lessor's interest in this fund would be available in season to be applied upon the excess, which must be at once paid off in order to make the new mortgage a first lien. The position in which the lessor was placing itself was one in which its only business would be to make such contracts as the lessee should approve, and after the completion of the road keep up its corporate organization at the expense of the lessee, and apply to its own use the rental which it should receive. The omission of both parties to make the inventory of demised property for which the indenture called has no bearing upon the present question. While there are a number of expressions in the indenture which would not have been used if the only property demised were this right and similar rights, there are none which are specially significant when it is once admitted that this right with other property of many different kinds was demised. It was of course so improbable that the right would continue as an unadjusted equitable claim for ninety-nine years, that the parties could not have meant that it should be returned to the lessor in like good order and condition as when demised, using that phrase literally. But the phrase is in substance suitable enough to do justice between the lessor and the lessee with respect to the right leased, and is used appropriately and comprehensively with reference to all the demised property as a whole. If the right had been to an ascertained balance of money due and payable by the trustees, the parties might or might not have included it in the demise, and if they did include it they would probably have made some express stipulation as to its application by the lessee, and very likely as to

interest and to repayment at the end of the term.   But it was not money or likely to be the means of causing any speedy payment of money, and was perhaps of no value whatever, and therefore the absence of any clause in the indenture having special relation to the treatment of the right or of its proceeds is not significant.   The rent reserved was not fixed by the income of the demised property, but by the gross receipts from the operation of the railroad, and the clauses about taking possession raise no argument that this right did not pass, any more than they would an argument that any incorporeal right did not pass.

We consider that it is useless to distinguish from the present case the numerous cases cited by the appellant in which broad general terms like the word " property " have been construed as restricted in meaning by the other portions of the instruments in which they appear, as each such case must stand mainly upon its own peculiar circumstances.                      *Decree affirmed.*