704

## LOUISVILLE & N. R. CO. v. ROBIN et al.
### No. 10241.

Circuit Court of Appeals, Fifth Circuit.

May 6, 1943.

Harry McCall, of New Orleans, La., and Bernard Cowen, of New York City, for appellant.

Louis G. Lemle, Herbert W. Christenberry, U. S. Atty., and N. E. Simoneaux and Robert Weinstein, Asst. U. S. Attys., all of New Orleans, La., for appellees.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The Louisville and Nashville Railroad Company on November 28, 1938, filed a petition in the District Court for the appointment of a successor trustee to recover from the State of New York a fund of $10,890, which that State had taken over from a New York bank as an abandoned account. The fund was alleged to be the balance of a fund put into the hands of trustees by the Circuit Court in 1880 to be disbursed under a decree of the court, which balance was alleged now to belong to the petitioner. The Court appointed James A. Robin as successor trustee, he recovered the fund, and reported to the Court its history, and recommended that it be paid into the registry of the Court to be after five years, if unclaimed, covered into the Treasury of the United States pursuant to 28 U.S.C.A. § 852. The recommendation was pursuant to the prayer of an intervention filed by the District Attorney in behalf of the United States. The Railroad Company excepted to the report, reasserting its claim to the fund. The Court found the facts to be as stated in the report and ordered the fund paid into the registry of the Court. The Railroad Company appeals.

The important facts in the report, briefly stated, are these: The New Orleans, Mobile and Texas Railroad Company, incorporated by the State of Alabama in 1866 to construct a railroad from Mobile to New Orleans, issued $4,000,000 of first mortgage bonds secured by a deed of trust on all its property, owned and to be owned, Morgan and Raynor being trustees in the deed of trust. There was also a second mortgage, in which Ames and Williams were trustees. Defaults occurred July 1, 1874, and in 1879 Morgan and Raynor, under court order, took possession of and operated the railroad as trustees and receiv-

ers. A sale of the railroad and all the mortgaged assets was made under decree of foreclosure of both mortgages on April 24, 1880, at which sale the properties were bought in on a bid of $4,000,000 by representatives of a bondholders' committee holding $3,858,000 of the first mortgage bonds. The decree of sale provided that this committee might bid, and use the dividends payable on their bonds in part payment, with such additional sums of cash as might be required for the payment of expenses of the receivership and sale, and dividends due to others; and that any surplus from the sale should be paid to the trustees of the second mortgage. The bondholders' committee had an agreement with the Louisville and Nashville Railroad Company to issue $5,000,000 of its bonds, to be used in part to raise the necessary cash to finance the sale, and in part to be exchanged bond for bond, for the foreclosed first mortgage bonds, after which exchange "all the right, title and interest of said bondholders in the said railroad, franchises, equipment and property * * * shall become the absolute property of the purchasers or their assigns * * * and thereafter the new bonds shall be the complete and full measure of the interest of the bondholders." The Louisville and Nashville Railroad Company was by this agreement also to take a fifty year lease of the railroad. Immediately after the sale the purchasers, representing the bondholders' committee, obtained a new corporate charter under a statute of Alabama authorizing purchasers of a railroad so to do, with $4,000,000 capital stock to be fully paid by a transfer of the railroad properties of all sorts. Thereafter the sale of the railroad was confirmed by the Court, and at the direction of the bondholders' committee, who had assigned their bid, the property was conveyed to the new corporation. The fifty year lease was then made to the Louisville and Nashville Railroad Company; and the report states that all the assets of the new corporation, both real and personal, were later acquired by the Louisville and Nashville Railroad Company so that it is the successor of the new company. We are not told how this was accomplished, nor whether the old first mortgage bonds deposited with the bondholders' committee were ever acquired by the Louisville and Nashville Railroad Company by exchange for new bonds of the latter company, as agreed.

On May 24, 1880, Morgan and Raynor, as receivers and trustees, made their report to the court, showing a full disposition of the proceeds of the sale, except that 132 of the first mortgage bonds had not been presented, nor had certain coupons maturing prior and subsequent to July 1, 1874, been presented, for all of which they were holding $109,882. It does not appear what the face of the coupons amounted to, for which $83,253 was retained, but the $26,629 held for the 132 bonds is stated to be "at the rate of $201.72 per bond to be paid and indorsed on each bond when presented." From this it is evident that a dividend of only $201.72 on each bond of $1,000 was declared from the net proceeds of the sale. In December, 1887, the executors of Morgan and Raynor reported to the court that of the fund of $109,882, $73,594 had been paid out to coupons, and $24,612 had been paid on 122 bonds, leaving 10 bonds unpresented, for which $2,017 remained on hand. This, with the balance for coupons, made a fund of $11,675. Another trustee was appointed, who deposited this fund in the New York bank, paid it down to $10,887, and after living to the age of 104 years, died. Twelve years after his death the Bank, no one claiming the fund, turned it over to the State of New York as an abandoned account.

■ The appellant claims here that the part of the fund which is held to pay coupons maturing prior to July 1, 1874, was free money of the original debtor deposited by it to pay said coupons, which money now passes to appellant as the successor of the original railroad corporation, the coupon holders having lost their right to it by abandonment, limitation, or payment presumed after twenty years. The claim cannot be sustained. The order of June 1, 1880, establishing the fund of $109,882, expressly states that it is the remainder of the proceeds of sale, held for bondholders who did not join in the purchasing agreement, and was their "ratable share." The trustees' executors in their petition to the court refer to the balance then on hand as "the proportionate amount allowed and payable on each coupon or bond as fixed by said order and report." There is nothing to show that any part of the fund was not the proceeds of the sale of the mortgaged property, standing in the place of the property as security for the bonds and coupons. Moreover, if any of it were free funds of the debtor corporation, they be-

long to its creditors rather than to a successor. Under the Alabama statute providing for reincorporation of a purchased railroad the new corporation succeeds to the franchises and faculties of the old corporation but not to its property or liabilities. Mobile & Montgomery Ry. Co. v. Steiner, McGehee & Co., 61 Ala. 559. Free funds would remain assets of the original corporation.

■ The entire proceeds of the sale of the mortgaged property, to which the lien of the mortgages is by a familiar principle transferred, belong to the first mortgage bond and coupon holders until they are paid in full, and then to the second mortgage bondholders. The net proceeds appear to have sufficed only for a dividend of .2017 per cent to the first mortgage creditors. If there are not so many bonds and coupons to be paid as were figured on, the balance on hand ought to be distributed as a second dividend. It does not revert to the mortgagor or its successor. The Court, having the funds in its hands as a res for distribution, has full jurisdiction to determine the distributees. In cases of receivership, or foreclosure where the distributees are many and unknown, it is usual to fix a date by which claims against the fund must be filed in order to participate, and to serve the order by publication. See 53 C.J., Receivers, §§ 393, 394; St. Louis & S. F. R. Co. v. Spiller, 274 U.S. 304, 305, 47 S.Ct. 635, 71 L.Ed. 1060; United States Trust Co. v. New Mexico, 183 U.S. 535, 22 S.Ct. 172, 46 L.Ed. 315; Western New York & P. R. Co. v. Penn Refining Co., 3 Cir., 137 F. 343; North American Co. v. St. Louis & S. F. R. Co., D.C., 288 F. 612; Dickinson v. Universal Service Stations, 9 Cir., 100 F.2d 753, 754. Section 57 of the Judicial Code, 28 U.S.C.A. § 118, appears to afford a statutory basis for the service by publication of persons having a lien on the fund. Such an ascertainment of distributees ought to have been made in this matter long ago, but it is not too late. If after due fixing of a reasonable date, and publication addressed to all holders of the bonds and coupons of the original railroad company, no other claimants appear, the fund should be applied to the claims under the first mortgage that have been filed. If the Louisville and Nashville Railroad Company did acquire first mortgage bonds in exchange for its own bonds as was agreed, it of course is entitled to the second dividend on the bonds it acquired. If no other claimants can now be found, it may thus get the whole fund. We perceive no other right or title it has to it.

We have no hesitation in concluding that it would not yet be proper to pay the fund into the registry of the court. It is the duty of the present trustee and the court to take the steps pointed out for finally distributing it. This money does not appear to have been adjudicated to belong to any particular person who has failed to claim it, as is contemplated in 28 U.S.C. A. § 852. It is a fund set apart for distribution to a class or classes, to-wit, the first mortgage bondholders and coupon holders. If some of the class do not appear to claim their share, it goes to the other members of the class. If no claimant secured by the mortgage can after due proceedings be found, then and only then would it properly be treated as unclaimed money. It was so held in American Loan & Trust Co. v. Grand Rivers Co., C.C., 159 F. 775. Brown v. Pennsylvania Canal Co., 3 Cir., 279 F. 417, did not involve a fund arising from a mortgage sale, but money paid into court by Pennsylvania Railroad Company to satisfy claims against it for diversion of funds made by bondholders of Pennsylvania Canal Company. The nature of the case and grounds of decision can best be understood from the opinion in the District Court, 274 F. 467. Redistribution to members of a class when some of the class could not be found was recognized as the general rule, but was thought inapplicable because the judgments of the bondholders against the railroad company were held to be several, so that what the railroad company paid in was the several property of each bondholder rather than a common fund to be distributed among them as a class.

The judgment is reversed for further consistent proceedings.

HOLMES, Circuit Judge (dissenting).

I think the judgment ordering the money to be deposited in the registry of the court should be affirmed. It should have been so deposited more than sixty years ago. The mandate of the statute is clear, and failure to comply with it is indefensible. I refer to the provision that requires all moneys paid into any court of the United States, or received by the officers thereof, in any cause pending or adjudicated in such court, to be forthwith deposited with the

Treasurer, or a designated depository of the United States.[1]

The next section of the Revised Statutes[2] provides that no money so deposited shall be withdrawn except by order of the judge or judges of said court, and that, in every case in which the right to withdraw money so deposited has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, it shall be the duty of the judge or judges of said court to cause such money to be deposited in the Treasury of the United States in the name and to the credit of the United States. It cannot be denied that the right of the unknown holders of the bonds and coupons to withdraw the money has been adjudicated; that such right is not in dispute; and that said section would be entirely applicable but for the failure of the court years ago to comply with the preceding section.

The first section of the statute is applicable in this case, because the property was sold under an order of court, by officers appointed under a decree of the court, and there was no agreement by the parties to dispose of the money otherwise than as provided by the statute.[3] In fact, no such agreement was possible as to that portion of the fund belonging to the unknown bond and coupon holders. The strict enforcement of this statute would go far toward preventing abuses in federal receiverships. The ill effects of violating it are illustrated to some extent by what has happened in this case.

On June 1, 1880, the trustees' report was confirmed, at which time the court found that there remained in the hands of the trustees the sum of $109,882.23 as the ratable share of the bondholders who had not presented their claims. Instead of ordering this sum to be paid into the registry of the court where the total cost of receiving, keeping, and disbursing it would have been one per cent,[4] or $1,098.82, the court ordered the trustees to deposit the same to their own account in the United States Trust Company in New York. This was done; the fund was reduced in various ways, including payment of claims; and thereafter the trustees died.

In 1887 their executors petitioned the court for a settlement of their accounts and to appoint a new trustee to complete the payments still to be made to holders of outstanding bonds and coupons. The petition recited that out of the fund that had been ordered deposited there remained $11,675.13. There was also on hand the sum of $3237.02, which had been allowed by the trust company as interest. This sum the court ordered distributed as follows:

| | |
|---|---:|
| To David F. Merrit, for services rendered in and about the fund | $1,000.00 |
| To David F. Merrit, for disbursements | 23.25 |
| To Daniel Lord, Jr., attorney for executors of Edwin D. Morgan | 1,034.50 |
| To Bartow L. Weeks, attorney for executors of James A. Raynor | 500.00 |
| To New Orleans, Mobile & Texas Railroad Company as reorganized | 679.27 |
| | $3,237.02 |

On January 26, 1888, John A. Stewart was appointed successor trustee and received the sum of $11,675.13,[5] which he forthright deposited in the United States Trust Company of New York. So far as the record shows, no further interest was paid on this fund, but $784.56 was withdrawn therefrom pursuant to an alleged order of court, though no such order can be found. Thirty-eight years thereafter, John A. Stewart died. Subsequent to his death the fund was deemed abandoned, and in 1938 it was transferred to the Comptroller of the State of New York under the laws of that state. Thereupon a successor trustee was appointed by the court below and obtained possession of said fund from the Comptroller of the State of New York, a small sum being deducted therefrom for advertising it as an abandoned fund, and $30 being deducted to cover the premium on the trustee's bond.

The present trustee now seeks to be discharged, and the court has allowed the

---

[1] 28 U.S.C.A. § 851; R.S. Sec. 995. This section was derived from the Act of March 24, 1871, see Ch. 2, 17 Stat. 1.

[2] 28 U.S.C.A. § 852; R.S. Sec. 996.

[3] 28 U.S.C.A. § 851; R.S. Sec. 995; Thomas v. Chicago & C. S. Ry. Co., C. C., 37 F. 548.

[4] 28 U.S.C.A. § 555.

[5] In its decree of January 26, 1888, the court says that this is "the amount still due to the holders of outstanding coupons and bonds as stated in said account filed herein and settled hereby." See p. 21 of transcript.

following additional sums to be deducted from said fund:

$400 to the Trustee, James A. Robin;
500 to Bernard Cowan for his services as attorney for the trustee;
600 to Louis G. Lemle for services as attorney for the trustee.

I do not question the reasonableness of these allowances except in comparison with what the expense of handling this fund would have been if the money in the first instance had been deposited in the registry of the court as required by the federal statute above mentioned. The amount recovered from the Comptroller of the State of New York was $10,887.59, since reduced to $10,857.59. A fee of one per cent on that would be $108.58. The fees allowed below to this trustee alone (appointed in 1938) and his attorneys amounted in the aggregate to $1,500.

Courts should decide, upon the law and the facts, the issues presented to them. In the court below the appellant, as alleged successor of the mortgagor, claimed this fund in its own right on the theory that the trust had failed, and urged that the money be paid to it, after providing for certain fees and commissions. On appeal, the appellant "does not urge that the holders of the outstanding bonds and coupons be declared to have abandoned or forfeited their rights by their continued forbearance and failure to act over a period of upwards of sixty-two years".[6] It urges that the judgment be reversed; that part of the fund be paid to it as successor aforesaid; and that the balance be turned over to it in trust upon certain conditions including the execution of a bond to run for a reasonable time.

There is no reason to temporize in this matter. The facts are stipulated and the law is statutory. He who runs may read. We should decide the actual case before us, not a hypothetical case to be presented in the future; and whatever we do, we should not leave the corpus of this estate in the hands of private trustees, like Prometheus bound, to be preyed upon for fees and costs and surety-bond premiums. We should order the money to be paid immediately into the registry of the court, whereupon the United States will become the permanent statutory trustee. Then the Government will furnish its own salaried attorneys to defend this trust against unfounded claims. The fee of one per cent is all that will ever be charged.[7] There will be no premiums on surety bonds, and no additional expense of any kind. The beneficiaries of the trust may prove their claims at any time. There will be no individual trustee to die, no abandoned trust, and no need to appoint a successor trustee with attendant court costs and attorney's fees. With safety, economy, and permanency on the side of the United States, would any prudent business man (if afforded such an option) choose an individual trustee? If not, then why should judges be blind to something that any tyro in business could see? Why should trust funds be dissipated? Why put the estate to further expense, when the sovereign federal government is willing to act as trustee, and the statute gives the court no discretion in the matter in the absence of an agreement of the parties?

This is not a case of removing clouds, or reaching parties having a lien, as to which publication may permit a bar. These unknown persons are the equitable owners of vested interests confirmed by judicial decree. Property so held may be the subject of sale or gift inter vivos; it may pass by will or by the laws of descent and distribution; it may escheat to the state for the want of heirs in the event of intestacy;[8] but the vested interest of a particular cestui que trust never passes to other cestuis merely because not claimed within a reasonable time. There is no analogy to the discovery of new assets requiring a second distribution to creditors. We have here a new trustee but no additional assets. The corpus of the estate has remained the same since January 26, 1888, except for the deduction of a few items. There is no reason here to apply any principle of dividend payments, since the money long ago was adjudicated to belong to definitely designated persons who failed to claim it, thus complying with all the requisites of said section 995, 28 U.S.C.A. § 851.

Let us turn to the merits of appellant's claim to this fund. A new and strange doctrine is urged in the exceptions to the report of the trustee. Therein it is alleged that "the Court did not part with the title to the undistributed portions of said $109,882.23 but retained title and control thereof and had the right and authority at all times to revoke the directions in said order

[6] Brief on behalf of appellant, page 34.
[7] 28 U.S.C.A. § 555.
[8] United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840; 1 Bogert, Trusts and Trustees, Ch. 11, § 187 et seq.

of June 1, 1880, * * * and change the designations and directions therein set forth".[9] Again the appellant alleges "that the Court never parted with the title to the undistributed part thereof".[10] I cite the record, because the suggestion that the title to this property was ever in the court seems remarkable to me. The distinction between title and jurisdiction is as clear as the difference between mine and thine. If one has title to property, one can deal with it freely; if a court has jurisdiction over property, it must deal with it as law and justice require. The court is asked to amend a decree entered by it sixty-three years ago, which would deprive beneficiaries of an interest that vested in them by virtue of the decree. If this may be done, to what purpose are statutes and of what avail are final judicial orders and decrees?

The items comprising the aggregate amount of $11,675.13 entrusted to the trustee under the order of January 26, 1888, were the following:

(1) $2,017.25 held for payment upon ten outstanding bonds.

This amount was part of the purchase price paid by the committee at the foreclosure sale. At the moment of payment, complete title to this money passed to the trustee, and thereafter the purchasing committee had no right or title to it or interest in it. When the lower court decreed that this portion of the purchase price should be held for payment of outstanding bonds, a trust fund for the bondholders was thereby established and became a permanent appropriation available at all times thereafter for payment of the bonds and coupons when presented. Neither the New Orleans, Mobile & Texas Railroad Company, as reorganized, nor the Louisville & Nashville Railroad Company, as the successors of that corporation, was entitled to both the property sold and the proceeds of the sale.[11]

(2) $6,250.56 held for payment of coupons due subsequent to July 1, 1874.

It was provided in the deed of trust that, upon default, the trustees should take possession of and operate the railroad and receive all revenues therefrom and, after payment of costs of operation, should pay the interest on the bonds. Since this money was collected by the trustees after default, it was received by them as trustees of an express trust, and continues to be held for account of the coupon holders that have the equitable title thereto.

(3) $3,407.32 held for payment of coupons due prior to July 1, 1874.

Neither the purchasing committee nor the Louisville & Nashville Railroad as its successor had or has any claim to this fund because, as in the case of interest collected by the trustees after default, moneys in the hands of the trustees were not included in the sale.[12] While there was no express trust as to this item so long as it remained in the hands of the disbursing agent of the railroad company, when it came into possession of trustees, who were officers of the court below, and when it was commingled with other funds that in equity and good conscience belonged to the creditors, including the unknown bondholders, and was decreed to be the proportionate share of definite bond and coupon holders, it thereby became a trust fund and has been held in trust for sixty-three years. In subsequent decrees appointing successor trustees the court repeatedly has dealt with it as a trust fund that remained to be claimed by certain bondholders whose names and addresses were unknown. Realizing this, by motions made January 24, 1941, the appellant now seeks to amend what it calls the orders of June 1, 1880, and January 26, 1888. The proposed amendments would upset a permanent trust that was judicially established sixty-three years ago and on the faith of which the court, its officers, litigants, and unknown claimants may have acted or refrained from acting during all of these years.

The majority opinion says that this money does not appear to have been adjudicated to belong to any particular person who has failed to claim it; that it is a fund set apart for distribution to the first mortgage bond and coupon holders. In my opinion, with deference, the record does not support this statement. The order discharging the trustee, dated June 1, 1880, is directly to the contrary. After stating that the cause came on to be heard with a view to the final settlement of the trustees' accounts up to the date of delivery to the purchasers of the deed and the property, the order further recites as follows: "* * * it appearing from the report,

---

[9] Page 40 of the transcript.

[10] Page 45 of the transcript.

[11] United States v. Cochrane, 5 Cir., 87 F.2d 3; Pennsylvania R. Co. v. United States, 3 Cir., 98 F.2d 893; Gray v. Massachusetts Cent. R. Co., 171 Mass. 116, 50 N.E. 549.

[12] Osterberg v. Union Trust Co., 93 U. S. 424, 429, 23 L.Ed. 964.

that the accounts are correct and that there remains of the money received from the sale in their hands for the bondholders who did not join in the purchasing agreement and who have not presented their bonds to the Trustee and generally were not proven to the Court, the sum of $109,882.23 as the ratable share of these bondholders; the Court, upon consideration thereof, orders the Trustees to hold the same for disbursement under the deed of trust, and that they deposit the same in the United States Trust Company in New York, subject to their order for that purpose and that the said Trustees be now discharged from their trust, except for the performance of this duty and that they report to the Court their action herein relative thereto."

The entire fund in controversy was a part of the above mentioned sum of $109,882.23, and, as the greater includes the less, the recital indicates that the fund in controversy was "received from the sale" of the property embraced in the deed of trust given to secure the bonds and coupons; but in any event this sum of $109,882.23 was then adjudicated to be held in trust for the bondholders who did not join in the purchasing agreement and who had not presented their bonds to the trustee and generally were not proven to the court. From this the conclusion is inescapable that the bondholders who joined in the purchasing agreement surrendered their bonds and were paid their full share of the money in the hands of the trustees, leaving "the sum of $109,882.23, as the ratable share" of definite bond and coupon holders. Id certum est quod certum reddi potest.

Therefore, the fund was adjudicated to belong to particular persons, viz., the holders of designated bonds and coupons. The legal effect of the adjudication was the same as if the decree had given the name of each holder of certain bonds and coupons; nor would their negotiability have been affected thereby. They would have remained as negotiable as they were before foreclosure of the deed of trust. It is true in one sense that the trust was adjudicated for the benefit of a class, just as the deed of trust was executed for the benefit of a class, but nevertheless each member of that class was the individual equitable owner of a pro rata share of the property conveyed in the trust instrument.[13] In like manner the lien of the deed of trust was transferred to the proceeds of sale.[14] Holders who joined in the purchasing agreement and presented their bonds received their share of the trust fund and ceased to be beneficiaries of the trust.[15] The others became the sole beneficiaries of their ratable share, the sole cestuis que trust; and the trustees were ordered to hold the money for them. "Except for the performance of this duty", i. e., to pay the remaining bondholders their ratable share, the trustees were finally discharged from their trust.

Almost exactly sixty-three years after the order was entered discharging these trustees with respect to duties that were completely executed, and fifty-eight years after the death of both trustees, the defunct portion of the trust (being the entire trust except as to a single duty that remains unexecuted) is sought to be revived by the simple expedient of amending the decree entered in 1880 and putting in it something entirely new. The present successor trustee, with only one duty to perform, would be given additional duties and responsibilities with respect to persons that ceased to be beneficiaries or parties in interest on June 1, 1880.

As to the source of the trust fund now in controversy, the same conclusions must be drawn, whether we look to the report of the present trustee or to the order of June 1, 1880, discharging his predecessor, which is that in 1880 the court below adjudicated the said sum of $109,882.23 to be the ratable share of the bondholders that had not presented their bonds, and set aside this sum

---

[13] There may be a single beneficiary or several beneficiaries of a trust, but, except in the case of charitable trusts, each cestui que trust must be a definite person. This rule is not very strictly applied, and it is not necessary that the beneficiary be named if so described as to be capable of being identified and distinguished from every other human being. 65 Corpus Juris, Sec. 24, p. 234. The members of a definite class of persons may be the beneficiaries of a trust if all the individuals comprising its membership are ascertainable within the period of the rule against perpetuities. Restatement of the Law of Trusts, Ch. 5, Sections 112, 113, 120, 121, 122.

[14] It was expressly so adjudicated by the court in the decree of sale dated March 5, 1880. Record, page 13.

[15] Brown v. Pennsylvania Canal Co., 3 Cir., 279 F. 417. Cf. Denapolis v. United States, 5 Cir., 3 F.2d 722; National Milling & Chemical Co. v. Amalgamated Laundries, D.C., 7 F.Supp. 723.

for them as a trust fund with directions to deposit the same in the United States Trust Company in New York subject to disbursement to said beneficiaries upon order of the trustees. The sole purpose of the trust being to disburse a specific sum of money to definite persons, i. e., to holders of certain bonds and coupons,[16] and the achievement of this purpose not having become impossible, this court should not hold that the trust has failed by reason of the impossibility of its execution. It may be executed any day that the holders of the outstanding bonds and coupons appear and present their claims to the trustee, or to the court if the money is deposited as required by statute.

The decision about to be rendered brings the Third and Fifth Circuits into conflict, and this is another reason why I dissent.[17]

[16] The numbers and dates of maturity of the various coupons, and the numbers of the bonds entitled to share in the distribution of said fund, were shown in the schedule annexed to the executors' petition. See p. 16 of transcript.

[17] See Brown et al. v. Pennsylvania Canal Co. et al., 3 Cir., 279 F. 417.